1 | LINDA B. OLIVER (SBN 166720)
loliver@maynardcooper.com
2 | MAYNARD, COOPER & GALE, LLP
600 Montgomery Street, Suite 2600
3 | San Francisco, CA 94111
Telephone: (415) 646-4700
4 | Facsimile: (205) 254-1999

5 | Attorney for Defendant
HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY

6

7 | **UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
8

9 | DAVID EIGNER,

10 |     Plaintiff,

11 |   vs.

12 | HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,
13

14 |     Defendant.

Case No.: 2:17-CV-00211-VAP-JEM

**DEFENDANT'S NOTICE OF
MOTION AND MOTION FOR
SUMMARY JUDGMENT;
MEMORANDUM OF POINTS
AND AUTHORITIES**

Date: October 23, 2017
Time: 2:00 p.m.
Courtroom: 8A
Hon. Virginia Phillips

TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN THAT pursuant to the Federal Rules of Civil Procedure, Rule 56 and the Central District Civil Local Rule 56-1, on October 23, 2017 at 2:00 p.m. or as soon thereafter as this matter may be heard, in the Courtroom of the Honorable Virginia Phillips, located at 350 W. 1st Street, Los Angeles, California Defendant Hartford Life and Accident Insurance Company ("Hartford") will and hereby moves the Court for an order granting its motion for summary judgment on the ground that Hartford correctly determined that Plaintiff was no longer entitled to long-term disability benefits and, thus, Hartford is entitled

to judgment in this ERISA action.    Defendant requests that this Court grant summary judgment in its favor and against Plaintiff.

    This motion is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities, the Declaration of Hally B. Rupert, the administrative record filed with the Court and the argument presented by counsel at the hearing on this matter.


DATED: September 15, 2017              MAYNARD, COOPER & GALE, LLP


                                        */s/* Linda B. Oliver
                                        Linda B. Oliver
                                        *Attorney for Defendant*
                                        *Hartford Life and Accident*
                                        *Insurance Company*

DEFENDANT'S SUMMARY JUDGMENT MOTION

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................1

II. SUMMARY OF STATEMENT OF FACTS .................................................2

    A. The Plan ...............................................................................................2

    B. Plaintiff's Claim and Award of LTD Benefits....................................2

    C. Hartford's Ongoing Review of Plaintiff's Claim in 2015 and 2016

    Claim Determination.............................................................................3

    D. Plaintiff's Appeal ................................................................................7

    1. Hartford's Consideration of Plaintiff's Appeal and Appeals Decision9

    E. Hartford's Final Determination.........................................................12

III. LEGAL ARGUMENT..................................................................................12

    A. Plaintiff Bears The Burden To Prove That He Is Entitled To Further

    Benefits Under The Plan.....................................................................12

    B. Under the Clear and Unambiguous Plan Terms, Hartford Correctly

    Denied Plaintiff's Claim For Continued LTD Benefits. ...............................13

IV. CONCLUSION.............................................................................................23

DEFENDANT'S SUMMARY JUDGMENT MOTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*,
  458 F.3d 955 (2006) ...................................................................... 12, 13

*Arko v. Hartford Life and Accident Ins. Co.*,
  672 F. App'x. 693 (9th Cir. 2016)...................................................... 13

*Biggar v. Prudential Ins. Co. of Am.*,
  ___ F.3d ___, 2017 WL 3453341 (N.D. Cal. Aug. 11, 2017)............................ 16

*Black & Decker Disability Plan v. Nord*,
  538 U.S. 822 (2003) ...................................................................... 17, 18

*Duncan v. Cont'l Cas. Co.*,
  No. C–96–2421 SI, 1997 WL 88374 (N.D. Cal. Feb. 10, 1997)......................... 14

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989) ...................................................................... 12

*Haber v. Reliance Std. Life Ins. Co.*,
  No. CV 14-9566- MWF (MANx), 2016 WL 4154917 (C.D. Cal. Aug. 4,
  2016), *appeal dismissed*, 2017 WL 3917562 (9th Cir. Feb. 21, 2017)............... 19

*Hilyer v. Hartford Life and Accident Ins. Co.*,
  No. 2:09–cv–00843–JHH, 2011 WL 925027 (N.D. Ala. Jan. 31, 2011)............ 22

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,
  63 F. Supp. 2d 1145 (C.D. Cal. 1999), *aff'd* 370 F.3d 869 (9th Cir. 2004)........ 13

*Larson v. Old Dominion Freight Lines, Inc.*,
  481 F. Supp. 2d 451 (M.D.N.C. 2007) ................................................... 22

*Marantz v. Permanente Med. Group, Inc. Long Term Disability Plan*,
  687 F.3d 320 (7th Cir. 2012) ............................................................. 22

*Matthews v. Shalala*,
  10 F.3d 678 (9th Cir. 1993) ................................................................. 13

*McBurnie v. Life Ins. Co. of N. Am.*,
  No. EDCV 16–1250 JGB (KKx), 2017 WL 2457447 (C.D. Cal. June 6, 2017) 14

*Moutour v. Hartford Life and Accident Ins. Co.*,
  588 F.3d 623 (9th Cir. 2009) .............................................................. 20

*Muniz v. Amec Constr. Mgmt., Inc.*,
  623 F.3d 1290 (9th Cir. 2010) ............................................................. 12

*Opeta v. Nw. Airlines Pension Plan for Contract Employees*,
    484 F.3d 1211 (9th Cir. 2007) ............................................................ 12

*Randall v. Metro. Life Ins. Co.*,
    No. 15-cv-04343-JST, 2017 WL 476404 (N.D. Cal. Feb. 6, 2017) ................... 12

*Safavi v. SBC Disability Income Plan*,
    493 F. Supp. 2d 1107 (C.D. Cal. 2007) ............................................... 22

*Schramm v. CNA Fin. Corp.*,
    718 F. Supp. 2d 1151 (N.D. Cal. 2010) ............................................... 12

*Seleine v. Fluor Corp. Long-Term Disability Plan*,
    598 F. Supp. 2d 1090 (C.D. Cal. 2009) ............................................... 14

*Shaw v. Life Insurance Company of North America*,
    144 F. Supp. 3d 1114 (C.D. Cal. 2015) ......................................... passim

DEFENDANT'S SUMMARY JUDGMENT MOTION

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Plaintiff asserts a claim for disability benefits under an ERISA governed Group Long Term Disability Plan (the "Plan") sponsored by his former employer, Silgan.  Plaintiff claims that he is totally disabled from <u>any</u> occupation due to neck, back and shoulder pain and cervical spine conditions. However, the facts and substantial undisputed evidence from the Administrative Record show that Hartford's decision to the contrary was correct.   The quantity <u>and</u> quality of evidence collected by Hartford supporting its decision is overwhelming: 1 independent medical examination by an occupational medicine specialist, 2 peer reviews by medical doctors (including one by a physical medicine and rehabilitation specialist), video surveillance (showing Plaintiff performing physical activities beyond his self-reported functionality), 2 employability assessments, an in-person interview and a labor market survey.  This evidence confirms, beyond a doubt, Plaintiff's ability to perform sedentary work with reasonable restrictions for his acknowledged conditions.

The records from Plaintiff's treating physicians reflect primarily Plaintiff's own subjective complaints rather than objective findings.   Moreover, Plaintiff himself reports on several occasions that his pain stems from his activities, which include working out, golfing, excessive drinking, and a fourteen (14) hour beach festival (which was observed on surveillance).  In making its decision, Hartford did not reject Plaintiff's subjective complaints or the opinions of the treating physicians.  It ultimately – and correctly – however chose to credit other evidence supporting reasonable restrictions and limitations that still allowed for sedentary work capacity over disproportionately limiting restrictions.

Because the denial decision was correct under both the language of the Plan and applicable federal law, Hartford respectfully requests that the Court grant its

1    motion and deny Plaintiff's motion for summary judgment.

2    ## II.   SUMMARY OF STATEMENT OF FACTS[1]

3    ### A.   The Plan

4    Hartford issued Group Insurance Policy No. 303856 (the "Policy") to insure

5    the long-term disability program for eligible employees of Silgan Containers

6    Corporation ("Silgan"), including Plaintiff.   (AR 2260-2335).[2]   Because Plaintiff

7    received disability benefits for more than 24 months, the definition of "Occupation

8    Qualifier" that applies to Plaintiff is as follows:

> **Occupation Qualifier**
> *Disability* means that *Injury* or *Sickness* causes physical or mental
> impairment to such a degree of severity that *You* are:
> 1) continuously unable to engage in any occupation for which *You* are
> or become qualified by education, training or experience; and
> 2) not *Gainfully Employed*.

Plaintiff had the responsibility of submitting sufficient Proof of Disability

under the Policy.  "Proof of Disability" includes

> 5)   Objective medical findings which support *Your Disability*.
> Objective medical findings include but are not limited to tests,
> procedures, or clinical examinations standardly accepted in the
> practice of medicine, for *Your* disabling condition(s).

 (AR 2275).

### B.   Plaintiff's Claim and Award of LTD Benefits

Plaintiff worked as a safety manager for Silgan before he stopped working

on September 28, 2010.   (AR 1874).   The Employer's Statement of his LTD

---

[1] Attached hereto is a Statement of Uncontroverted Facts pursuant to this Court's
Standard Order, [Doc. 9] at page 4, Defendant Hartford Life and Accident
Insurance Company ("Hartford").
[2] Citations to "(AR ___ )" are to the applicable Plan document and the
Administrative Record, filed concurrently with this motion.  The Plan document is
labeled "AR 2259" through "AR 2335," and the Administrative Record is labeled
"AR 001" through "AR 2258."

application noted that his employment was "ending" due to job elimination.  (*Id.*) Plaintiff had undergone prior cervical fusions in 2007.  (AR 1881). At the time he left work, he indicated that he could no longer work due to shoulder, neck and back pain, and headaches. (AR 1876-77). His treating internist, Dr. Deutsch, indicated that Plaintiff had difficulty turning his neck, **but as of March 2011 that Plaintiff had <u>no</u> limits on standing, sitting, and walking.**  He also opined that Plaintiff should not carry, lift, push or pull more than 20 lbs., and that he could not reach or work overhead. (AR 1882).

Hartford awarded LTD benefits with a benefit effective date of March 28, 2011.  (AR 1986-1989). Effective March 28, 2013, Hartford awarded LTD benefits to Plaintiff under the second prong of the Occupation Qualifier disability definition noting that "[p]eriodically, we will provide you with supplementary claim forms so you can furnish us with continued proof of Total Disability."  (AR 1966).

## C.   Hartford's Ongoing Review of Plaintiff's Claim in 2015 and 2016 Claim Determination

After paying benefits for several years, in April 2015, Hartford undertook a periodic review of Plaintiff's claim.  (AR 1227-35, 1394-97, 1958-59).  It collected medical records from Plaintiff's treating physicians, including chiropractor Dr. Noah Splies, internist Dr. Gary Deutsch and cardiologist Dr. Gary Mitchell.  (AR 1954, 1956).

### 1.   <u>Treating Physician Records</u>

<u>Dr. Splies</u>: Plaintiff's chiropractor regularly treated him for back and neck pain. All of these visits reflected the same medical history reciting the same August 2014 x-ray results and the 2007 surgery.  (AR 1355-63).  Plaintiff's visits to Dr. Splies appear to coincide with flare-ups of pain related to specific incidents. For example, on April 29, 2015, Plaintiff reported that he played nine holes of golf which resulted in flared right left pain.  (AR 1360).  On July 20, 2015, Plaintiff

visited Dr. Splies complaining of flared right sciatic pain, left pelvic pain, mid-back pain and right knee back noting a new injury to his shoulders after engaging in an altercation with a lifeguard resulting in him being handcuffed.  (AR 1362). The chiropractor recommended he seek a second opinion from an orthopedist. (AR 1363).   Plaintiff then visited Dr. Splies several times in October 2015 complaining of overall pain after a slip and fall incident at a retail store. (AR 1272-1281). Dr. Splies again recommended that Plaintiff seek an orthopedic second opinion.  (AR 1275, 1281).

Dr. Deutsch: Plaintiff also saw his internist on a routine basis where he typically indicated that Plaintiff's neck and back pain were "fluctuating."  (AR 1294). Plaintiff described his pain as an ache and dull and indicated that his symptoms were aggravated by walking, but did not mention sitting.  (AR 1369, 1371).  Plaintiff's physical examinations were normal.  (*Id.*).  During an August 7, 2015 visit, Dr. Deutsch noted that plaintiff's musculoskeletal pain was mild to moderate, but concentrated in the elbow due to Plaintiff's June 2015 arrest after his altercation with a lifeguard.  (AR 1294). On physical exam, Dr. Deutsch noted only a mildly reduced range of motion in Plaintiff's right elbow due to the arrest incident, and did not mention spinal pain or problems.  (AR 1296). On December 10, 2015, Dr. Deutsch indicated that he did not believe Plaintiff could work forty hours a week due to pain and prior surgeries, but he did not supply specific restrictions and limitations at this time. (AR 1225-26).

Dr. Mitchell:  On July 6, 2015, Plaintiff saw his cardiologist for the first time in over nine months.  (AR 1283). Dr. Mitchell noted his recent arrest which had created some agitation though Plaintiff had been asymptomatic since his release. Dr. Mitchell also noted that that status of "his previous substance abuse is unclear" and that his only previous cardiac episode had been precipitated by substance abuse.  (*Id.*; AR 1285).  On December 4, 2015, Dr. Mitchell called Hartford and

DEFENDANT'S SUMMARY JUDGMENT MOTION

advised that Plaintiff had no restrictions or limitations from a cardiac perspective and suggested that Hartford contact Plaintiff's other treating physicians.  (AR 2085-2086).

### 2.   Hartford's Assessment Tools

Surveillance: Hartford arranged for surveillance of Plaintiff on several dates, including July 12, 2015.  (AR 1327-1352; Video)[3].  On July 17, 2015 in particular, Plaintiff was observed being highly physically active attending a beach festival and participating in related activities over the course of approximately fourteen (14) hours.  (AR 1333-1340).  Approximately 3 hours and 20 minutes of actual footage was captured, but the Report as a whole reflects activity for nearly 14 hours.  (AR 1328; Video). The Report summarizes the footage:

> We obtained approximately 3 hours 20 minutes of film of the individual as he entered and exited a vehicle; placed items inside a vehicle; drove; waved his right hand; drove a gold cart; closed a garage; sat; entered and exited a golf cart; pumped gas; bent at the waist as he screwed on a gas cap and leaned into a golf cart and sifted through items; unloaded equipment from the golf cart; carried four orange cones and placed them on the ground; carried several cases of water; carried a trash bag; conversed; carried a stroller and placed it in the back of the golf cart; retrieved the stroller from the cart; lifted a bale of hay; drank; twisted to his left as he looked behind himself; ran; walked; bent at the waist as he moved a tarp; ascended and descended stairs; and bent at the waist on several occasions.  The individual appeared to move in a normal manner and no discernible means of artificial supports were seen.

(AR 1328).

In-Person Interview:Given the surveillance and the fact Plaintiff's reported limitations and the restrictions provided by his treating physician appeared excessive based on the medical records in the file, Hartford arranged for an in-

---

[3] The video will be supplied to the Court conventionally and with the Court's courtesy copy.

person interview to be conducted at Plaintiff's residence. The interview on September 17, 2015 lasted for an hour. (AR 1323).  Plaintiff sat for the entire interview without any signs of pain or discomfort.  (AR 1325).  He reported that he could sit in a vehicle for about 30 minutes, but also reported traveling to Mexico and Hawaii on a few occasions. (AR 1309, 1326).

Independent Medical Examination (IME):   On January 20, 2016, Dr. Sri Mummaneni, an occupational medicine specialist, conducted an in-person medical examination of Plaintiff.  (AR 1191-1214).  After interviewing Plaintiff about his medical history, pain complaints and activity level, Dr. Mummaneni conducted a physical examination, reviewed Plaintiff's medical records and reviewed the surveillance video. (AR 1201-12).   As a board certified occupational medicine specialist and, with the benefit of a physical examination of Plaintiff, Dr. Mummaneni then rendered the following opinions: (1) Plaintiff should be able to "**sit for the majority of an average 8 hour day up to 40 hours a week, as long as he may change positions as needed**…"; (2) Plaintiff "can stand for 30 minutes at a time, and alternate with sitting during an 8 hour day.  He can walk for 30 minutes at a time and alternate with sitting during an 8 hour work day."; (3) Plaintiff has no restrictions on his ability to reach below the waist and at the waist level, but due to his post-cervical fusion and decreased range of motion in the cervical spine, he cannot reach overhead; and (4) Plaintiff can lift and carry up to 20 lbs. occasionally and 10 lbs. frequently up to 4 hours a day due to the effect of his cervical fusion and shoulder issues.  (AR 1213-14).

Employability Analysis:   On February 24, 2016, Hartford analyzed Plaintiff's ability to return to alternative occupations based on his functional capabilities, education, training and work history. (AR 1136-1155). Hartford adjusted Plaintiff's ability profile to incorporate physical recommendations with respect to no reaching overhead. The analysis yielded five sample sedentary

occupations that met Plaintiff's wage and physical requirements, and noted:

> The viable employment matches selected above could be performed with the need to alternate positions between sitting, standing, and walking as needed for comfort as they are positions which are performed primarily seated, but do include brief periods of standing and walking, which can be timed at the worker's own volition. As the positions are performed at the desk level, the jobs could reasonably be performed with the restriction of no reaching overhead.

(AR 1139).

### 3. Claim Termination Letter

Hartford terminated Plaintiff's LTD benefits effective February 29, 2016. (AR 1916-20).

### D. Plaintiff's Appeal

By letter dated August 22, 2016, Plaintiff, through counsel, appealed Hartford's benefits determination. (AR 1047-70). With this letter and through subsequent communications, Plaintiff submitted several exhibits with his appeal including medical records and forms prepared in 2011 and 2012. (AR 319-33).

### 1. Updated Medical Records and Physician Opinions.

Updated records from Dr. Mitchell, Plaintiff's cardiologist, reveal that Plaintiff was admitted to the emergency room in March 2016 for atypical chest discomfort following alcohol excess the previous night (in which he drank twelve beers). (AR 479). Follow-up cardiologist records from March and April 2016 note that he is "asymptomatic," that he "has no signs or symptoms of congestive heart failure," and that he is on "appropriate medical management." (AR 475-82). An October 28, 2015 stress test was also determined to be normal. (AR 502-03). Dr. Mitchell also submitted an August 11, 2016 letter in support of Plaintiff's appeal in which he indicated that stress could "adversely impact" his condition, however he provided no specific restrictions and limitations at this time. (AR 515).

Plaintiff's chiropractor and internist also submitted declarations both dated

July 30, 2016 detailing their treating history of Plaintiff's and their opinions that he could not return to work.   (AR 351-55, 526-28, 553-54).

On August 26, 2016, neurologist Dr. Sheehy examined Plaintiff and noted that, while Plaintiff has chronic neck pain, "there is no finding on the present MRI scan to account for it."  (AR 169).  Dr. Sheehy also commented on Plaintiff's arm paresthesias and indicated that he did not believe that surgery would bring about significant improvement.  (*Id.*)

Plaintiff also submitted an office visit note from an orthopedist who saw Plaintiff one time on September 13, 2016, and assessed Plaintiff with carpel tunnel syndrome and wrist pain on his left hand. (AR 217-220).  At that time, Plaintiff underwent a hand x-ray which reflected a "normal exam" demonstrating "no acute or chronic abnormalities."  (AR 219).

2.    Other Declarations and Records

In addition to medical records and doctors' opinions, Plaintiff submitted a "pain journal" reflecting dates and locations he felt pain, his own declaration and declarations of some of his friends.  (AR 357-61, 770-777).  Plaintiff's declaration, dated August 19, 2016, addressed the surveillance video reflecting him active at the "Surf Rodeo" beach festival for fourteen hours stating that he took pain medication and drank alcohol "to get through the day."  (AR 359).  John Drury, a friend of Plaintiff's and the Surf Rodeo producer, also submitted a declaration in which he said that Plaintiff did not do any heavy lifting at the Rodeo.  He added that "Dave spent the day sitting in the golf cart, and laying down in the Base Camp."  (AR 362-63).  Other friends of Plaintiff, his sister and his sons submitted declarations that also said Plaintiff suffered from pain and that he sat in the golf cart during the Surf Rodeo.  (AR 365-378).

3.    SSDI Notice of Decision

Plaintiff also submitted the April 26, 2013 Administrative Law Judge (ALJ)

8

opinion finding him disabled from September 28, 2010 through April 26, 2013. (AR 435-440).  The ALJ relied on 2010 physical therapy notes, a May 2010 MRI, March 2011 x-rays, a May 2011 opinion from Plaintiff's then-neurosurgeon, a consultation from October 2011, shoulder surgery notes from November 2011, an April 2012 opinion from his internist, and assorted medical records through April 2013.  In making her determination, the ALJ said that "[m]edical improvement is expected with appropriate treatment.  Consequently, a continuing disability review is recommended in 36 months."  (AR 440).

4.     Vocational Evaluation Report

Finally, Plaintiff submitted an August 22, 2016 vocational evaluation report completed by a consultant, which challenged Hartford's prior employability analysis on several fronts.  (AR 1029-1044).

**1.     Hartford's Consideration of Plaintiff's Appeal and Appeals Decision**

1.     Peer Reviews

In reviewing Plaintiff's appeal, Hartford requested that a board certified cardiologist and board certified physical medicine and rehabilitation specialist review Plaintiff's records and speak with his treating physicians.  (AR 296-98).

a.     *Dr. Borzak*: Dr. Borzak, a physician board certified in cardiovascular disease, reviewed Plaintiff's file on September 12, 2016 from a cardiac perspective.  (AR 189-198).   Dr. Borzak spoke with both Dr. Deutsch and Dr. Mitchell who both agreed that Plaintiff was <u>not</u> impaired from working from a cardiac standpoint.  They both described the one episode Plaintiff had suffered from as being brought on by a "substance abuse" (alcohol excess) incident and that those issues had resolved.  (AR 193).  Dr. Borzak opined that "there is no source of impairment related to cardiac medications or their side effects" nor was there any basis for cognitive complaints.  (AR 197).

9

      b.    *Dr. Krouskop*: Dr. Krouskop, a board certified physical medicine and rehabilitation specialist, reviewed Plaintiff's file and issued a report on September 26, 2016.  (AR 198-210).  Dr. Krouskop spoke with Plaintiff's internist, Dr. Deutsch, and his chiropractor, Dr. Splies.  Dr. Deutsch and Dr. Krouskop discussed the restrictions with respect to hand use grasping, but Dr. Deutsch did not agree or disagree with Dr. Krouskop. (AR 201).  Dr. Splies raised a possible radiculopathy diagnosis with the reviewing physician, but Dr. Krouskop, who had the benefit of all of Plaintiff's submitted and collected records, noted that electrodiagnostic studies from June 2016 found no evidence to support the presence of an ongoing cervical radiculopathy.  (*Id.*)  After reviewing all of the available test results and medical records, the surveillance and speaking with Plaintiff's treating physicians, Dr. Krouskop provided the following opinions: (1) "Mr. Eigner's multilevel cervical fusion and pain complaints would support a 20-lb. lifting restrictions"; (2) "Since his cervical range of motion is limited by the fusion, he should be restricted from work above shoulder level"; (3) "Mr. Eigner should also be allowed to change posture from sitting to standing once or twice per hour";  (4) and "The available medical evidence does not support that Mr. Eigner's medications and/or side effects have caused any persistent adverse effect to warrant any work restrictions." (AR 208-09).

      When asked about how Plaintiff's pain may impact his ability to function in a work environment, the physical medicine and rehabilitation specialist responded:

> Mr. Eigner complained of persistent neck/upper extremity pain.  As noted on multiple physical examinations, however; his shoulders have maintained functional forward flexion and abduction indicating he is using his upper extremities on a regular basis.  If he were not using his extremities on a regular basis, he would have more significant loss of range of motion.  Mr. Eigner's treating physicians have not pursued any new medication trials or initiated treatment with a long-acting narcotic, which would be expected if Mr. Eigner's pain complaints

were out of control.   Mr. Eigner's pain would be expected to be satisfactorily controlled in a work environment if he were to maintain his activities within the restriction/limitations [set out by Dr. Krouskop].

(AR 209).

        c.     *Dr. Krouskop Addendum*: On October 11, 2016, Dr. Krouskop reviewed newly submitted information and supplied an addendum to his prior report.   (AR 76-78).   Dr. Krouskop first noted that no new restrictions or limitations had been submitted by treating physicians.   He then reviewed the records and noted that Dr. Sheehy had not noted any adverse side effects from Plaintiff's prescription medication regimen, that Dr. Sheehy was not optimistic that surgical interview would result in improvement for Plaintiff and noted that, while the 2010 x-ray may have suggested the presence of DISH[4]-like changes, the more recent lumbar and thoracic spine x-rays "have identified multilevel disk space narrowing but they do not report findings consistent with anterior longitudinal ligament calcification or bridging osteophytes consistent with [DISH]."   (AR 77). He concluded by noting that the additional information was insufficient to change his prior opinions.   (AR 78).

        2.    <u>Updated Employability Analysis and Labor Market Survey</u>

        On October 17, 2016, Hartford undertook an updated employability analysis based on the functional capabilities provided by the peer reviews, including that Plaintiff should be allowed to change posture from sitting to standing once or twice an hour.   (AR 33-68).   Through its vocational clinical case manager, Hartford identified five sedentary occupations that Plaintiff could perform, including safety manager, risk and insurance manager, employee welfare manager, employment manager and office manager.   (AR 34).   Hartford also incorporated the results of a Labor Market Survey that determined the sample occupations were reasonably

---

[4] Diffuse Idiopathic Skeletal Hyperostosis (DISH).

DEFENDANT'S SUMMARY JUDGMENT MOTION

1  available in Plaintiff's local geographical area..  (AR 34, 100-120, 278).

2  **E.    Hartford's Final Determination**

3  Hartford upheld its prior adverse benefit determination on October 19, 2016.

4  (AR 1886-1891).

5  **III.   LEGAL ARGUMENT**

6  **A.    Plaintiff Bears The Burden To Prove That He Is Entitled To**
   **Further Benefits Under The Plan.**

7

8  The parties have stipulated that the Court should apply a *de novo* standard of

9  review.  Under the *de novo* standard, "[t]he court simply proceeds to evaluate

10  whether the plan administrator correctly or incorrectly denied benefits."  *Opeta v.*

11  *Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir.

12  2007).  Under this standard, the Court determines whether benefits were correctly

13  denied based on the evidence in the Administrative Record.  *Firestone Tire &*

14  *Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).  Indeed, the Court's review is

15  limited in most cases to the evidence that was before the claims administrator at

16  the time of its determination.  *Opeta*, 484 F.3d at 1217; *Abatie v. Alta Health &*

17  *Life Ins. Co.*, 458 F.3d 955, 970 (2006).  In reviewing the Administrative Record,

18  the Court "evaluates the persuasiveness of each party's case, which necessarily

19  entails making reasonable inferences where appropriate."  *Schramm v. CNA Fin.*

20  *Corp.*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010).

21  Even though the Court will review Hartford's determinations *de novo*,

22  Plaintiff maintains the burden of proving entitlement to benefits.  *Muniz v. Amec*

23  *Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010); *Schramm, supra*, 718

24  F. Supp. 2d at 1162; *Randall v. Metro. Life Ins. Co.*, No. 15-cv-04343-JST, 2017

25  WL 476404, at *16 (N.D. Cal. Feb. 6, 2017) ("the claimant has the burden of

26  proving by a preponderance of the evidence that he was disabled under the terms

27  of the plan."); *see also* (AR 2275) (requiring claimants provide proof of loss at

28

their own expense within 90 days initially and then within 30 days after Hartford's request while on claim). "[A] diagnosis alone … does not automatically amount to a finding that a claimant is disabled; the claimant must also establish that his condition renders him unable to perform an essential function of [any] job." *Arko v. Hartford Life and Accident Ins. Co*., 672 F. App'x. 693, 694 (9th Cir. 2016).

The Administrative Record establishes that Plaintiff did not (and cannot) meet this burden and Hartford correctly determined that Plaintiff was not entitled to continued LTD benefits under the Plan. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (Under a *de novo* review of an ERISA claim administrator's claim determination, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits.").

### B.   Under the Clear and Unambiguous Plan Terms, Hartford Correctly Denied Plaintiff's Claim For Continued LTD Benefits.

Hartford correctly terminated benefits in February 2016 based on the evidence it had before it at that time.  Hartford does not dispute that Plaintiff experienced pain from resulting from his prior back surgeries and cervical disc conditions.  However, just because Plaintiff experiences some pain does not mean that he is totally disabled as defined by the Plan, particularly under the "any occupation" standard that applied in 2016.  *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of impairment is insufficient proof of a disability.  **A claimant bears the burden of proving that an impairment is disabling**.").  As the Ninth Circuit explained: "That a person has a true medical diagnosis does not by itself establish disability … Sometimes [peoples'] medical conditions are so severe that they cannot work; sometimes people are able to work despite their condition; and sometimes people work to distract themselves from their conditions." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145 (C.D. Cal. 1999), *aff'd* 370 F.3d 869 (9th Cir. 2004).

13

Here, Hartford accepted Plaintiff's diagnoses, but did not ultimately accept the overly stringent restrictions and limitations provided by some of his providers, particularly where objective evidence undisputedly showed significant functionality. This result does not make Hartford's decision incorrect. Indeed, Hartford incorporated restrictions and limitations such as no overhead reaching into its employability analysis screening out those sample occupations that could require such tasks. (AR 1137) (adjusting ability profile to among other things "eliminate positions that would reasonably require reaching overhead").

Courts have recognized that a claimant's subjective reports of pain do not establish disability where, as here, other evidence in the record supports a finding to the contrary. *See Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1101-02 (C.D. Cal. 2009) ("LINA did not ignore Seleine's subjective complaints of pain. Rather, these complaints were subject to verification by objective medical evidence. LINA was under no obligation to accept them at face value … The Court finds that the opinions of Seleine and her treating doctors are insufficient by themselves to establish disability under the Plan requirements and case law."); *McBurnie v. Life Ins. Co. of N. Am.*, No. EDCV 16–1250 JGB (KKx), 2017 WL 2457447, at *8 (C.D. Cal. June 6, 2017) ("None of this is to discount Plaintiff's clear and documented experience of pain … But her experience of pain does not suffice to establish that Plaintiff is unable to return to work.") This is particularly true where Hartford's Policy expressly requires "objective medical findings" as part of Plaintiff's burden under proof of loss. (AR 2275); *see also Duncan v. Cont'l Cas. Co.*, No. C–96–2421 SI, 1997 WL 88374 (N.D. Cal. Feb. 10, 1997) (holding that insurer could not deny a claim for benefits due to lack of objective medical evidence **unless** the requirement that such evidence be submitted was clearly articulated in the policy).

1. Hartford Appropriately Relied on an Occupational Medicine Specialist's IME Report and the Subsequent Peer Review Reports

14

from Relevant Specialists over the Treating Chiropractor and Internist's Reports

In *Shaw v. Life Insurance Company of North America*, 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015), this Court analyzed the credibility of conflicting physicians' opinions by evaluating (1) whether they report subjective complaints or objective medical evidence; (2) the extent of the patient's treatment history; (3) the doctors' specialization or lack thereof; and (4) how much detail the doctor provides supporting his or her conclusions.  On balance and with the burden to prove disability squarely on Plaintiff, these factors favor Dr. Mummaneni, Dr. Borzak and Dr. Krouskop's opinions over Dr. Splies and Dr. Deutsch.

a.   *The Treating Chiropractor and Internist's Reports Largely Reflect Subjective Complaints over Objective Medical Findings*

First, Dr. Mummaneni conducted an in-person examination of Plaintiff. While Plaintiff argues that the examination was only twenty minutes long (AR 361), Dr. Mummaneni had enough time to evaluate Plaintiff's gait (which he described as "normal"), examine his cervical spine noting some limited range of motion on the cervical spine with no atrophy noted and normal muscle tone, examine his thoracic spine noting full range of motion, examine his shoulders noting decreased range of motion in the bilateral shoulders with normal muscle tone and no atrophy noted, examine the lumbar spine, and examine the bilateral hips, bilateral knees and perform a neurological examination of the bilateral upper and lower extremities.  (AR 1201-02).  Dr. Mummaneni acknowledged Plaintiff's diagnoses, including his post-surgical status (AR 1212).  His ultimate opinions on functionality were measured and balanced as they took into account Plaintiff's overall condition, the objective results of his physical exam, and Plaintiff's history:

> The claimant does have a cervical fusion and bilaterally decreased range of motion in his shoulders.  He does have limited range of motion in the cervical spine as demonstrated in exam and surveillance

video.  Overhead work would be difficult for him.  In addition this condition would make lifting moderate heavy objects difficult.

His walking, standing, lifting and carrying needs restrictions also due to the effect of his cervical fusion and shoulder issues limit the use of his upper body to assist in these activities.

(AR 1214).

In contrast, Dr. Deutsch's records vary on Plaintiff's ability to perform sedentary activities such as sitting, standing and walking.  First, in 2011, Dr. Deutsch provided no limits on sitting. (AR 1882).  In 2012, he indicated that Plaintiff could not sit for more than two hours a day, could not stand for more than two hours a day and could not walk for more than one hour a day.  (AR 320).  The only testing he referred to as support for these orthopedic restrictions, however, was a blood test and a chest x-ray.  (AR 319).  Then on July 30, 2016, although he indicated that Plaintiff could not work, he again did not complete the form indicating restrictions on sitting but instead referred to his earlier opinions.  (AR 533-35).  Yet, when a neurologist examined Plaintiff for the first time on August 29, 2016, he noted that, while Plaintiff reports chronic neck pain, "there is no finding on the present MRI scan to account for it."  (AR 169).  *See Biggar v. Prudential Ins. Co. of Am.*, ___ F.3d ___, 2017 WL 3453341, at *11 (N.D. Cal. Aug. 11, 2017) (assigning less weight to treating physician's opinion where her conclusions about the severity of symptoms were not supported by her own contemporaneous physical findings and objective evidence).

b.   *The Extent of Patient's Treatment History and the Resulting Opportunity for Bias*

While it is undisputed that both Plaintiff's internist and his chiropractor have a long history of treating Plaintiff, this factor should not be determinative here, particularly under the circumstances.  This Court recognized in *Shaw* that a long history treating a Plaintiff may in fact create an incentive for a treating physician to

---

16

"favor" a Plaintiff.  *Id.* at 1131 ("[T]he long history lends some credibility to Dr. Levy's reports, but may also have resulted in assessments that were biased in [Plaintiff's] favor."); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled' so a treating physician, in a close case, may favor a finding of 'disabled.'").

This potential for bias by the treating physicians is demonstrated by the overreaching of Plaintiff's chiropractor whose opinions on Plaintiff's functionality essentially suggest Plaintiff is nearly bed-ridden.  *Shaw*, 144 F. Supp. 3d at 1130 ("A treating physician's report is particularly unreliable where the physician's records do not adequately support a specific diagnosis.").  Dr. Splies opines that Plaintiff can work less than 1 hour a day, with no more than 1 hour standing, 1 hour walking, 1 hour sitting and 1 hour driving.  (AR 553).  Taking these opinions literally, Plaintiff would have no other activity to do but lay down for twenty hours a day.   The objective medical testing provides no support for such dramatic restrictions.   Moreover, the fourteen hours of combined activity observed by the surveillance team flatly contradicts this characterization. Not only is that assertion flatly contradicted by Plaintiff's observed and admitted activity level, it is in no way confirmed by either an occupational medicine specialist who examined Plaintiff in-person or a physical medicine and rehabilitation specialist who reviewed his records.

The latest objective testing of the spine referenced in the records is included in the neurologist's report submitting on appeal.  Dr. Sheehy references: (1) a June 6, 2016 MRI scan of the cervical spine.  Dr. Sheehy indicated that it showed a "stable fusion, no foraminal compromise and C4 myelomalacia, stable since 2007; and (2) a June 6, 2016 CAT scan of the cervical spine showing discogenic change without canal stenosis.  (AR 169).  Neither support the chiropractor's overreaching

1   restrictions and limitations.  In fact, as Dr. Krouskop notes in his addendum report,

2   the latest testing do not report findings consistent with ligament calcification or

3   bridging osteophytes consistent with the chiropractor's prior assertions that

4   Plaintiff had DISH.  (AR 77)

5       In addition, the chiropractor opined that pain medications and opioids affect

6   Plaintiff's cognition and coordination but his records are devoid of any notations.

7   (AR 554).   Such opinions, while arguably outside his scope of chiropractic

8   expertise, also fly in the face of Dr. Krouskop's review of Plaintiff's pharmacy

9   records which suggest his prescription levels would not even allow for Plaintiff to

10  take one pain tablet a day.  (AR 209); *see also* (AR 77) (where Dr. Krouskop

11  analyzed the neurologist's newly submitted record and noted that "[n]o adverse

12  medication side effects were described.")

13

14      c.   *The IME and Peer Review Doctor's Specializations are Narrowly
             Tailored to Plaintiff's Complaints*

15      Plaintiff's primary complaints for which he seeks disability benefits were

16  related to shoulder, neck and back pain.  Yet, his treating physicians were not

17  orthopedists, nor were they pain management specialists, occupational medicine

18  specialists or even physical medicine and rehabilitation specialists.  *See Nord*, 538

19  U.S. at 832 ("**The assumption that the opinions of treating physicians warrant**

20  **greater credit than the opinions of plan consultants may make scant sense …**

21  **when a specialist  engaged by the plan has expertise the treating physician**

22  **lacks.**").

23      Plaintiff saw primarily an internist (Deutsch) and a chiropractor (Splies)

24  during the relevant time frame.  While he submitted a handful of orthopedic

25  records on appeal, they all relate to **hand** pain, and not his neck or back.  *See, e.g.*

26

27

28

(AR 217-19).[5] Dr. Splies even recommended that Plaintiff seek a second opinion for his primary pain complaints on numerous occasions and Plaintiff apparently never did.  (AR 1451) ("Patient needs to be under the care of a rehab spinal cord physiatrist."); *see also* (AR 1275, 1281, 1363) (chiropractor recommending orthopedic second opinion); *Shaw, id*. at 1133; *Haber v. Reliance Std. Life Ins. Co.*, No. CV 14-9566- MWF (MANx), 2016 WL 4154917, at *6 (C.D. Cal. Aug. 4, 2016), *appeal dismissed*, 2017 WL 3917562 (9th Cir. Feb. 21, 2017) ("[Plaintiff's] failure to observe recommended follow-up procedures specifically aimed at her [] complaints … [is] indicative of the degree of impairment she suffers.")  Hartford then obtained the very specialty recommended by the chiropractor (Dr. Krouskop, a board certified physiatrist (physical medicine and rehabilitation specialist)) to review Plaintiff's medical records and opine on appropriate restrictions and limitations.  This specialist again acknowledged Plaintiff's multilevel cervical fusion and pain complaints and recommended appropriate restrictions and limitations to accommodate his situation including a 20-lb. lifting restriction, no working above shoulder level, and that he be allowed to change posture from sitting to standing once or twice per hour.  (AR 207).

In contrast to the occupational medicine and physical medicine specialists, Plaintiff also did not appear to seek treatment from any provider who focuses on pain.  Indeed, with respect to pain, Dr. Krouskop even notes on his review that "the available information does not support that his treating providers have initiated any alternative pain medication trials (or the use of long acting narcotics) to improve

---

[5] Dr. Krouskop reviewed the new medical records submissions related to Plaintiff's carpel tunnel condition and determined that neither the neurologist nor the therapist had any restrictions and limitations related to this condition, and the additional information was insufficient to warrant any changes in the restrictions and limitations included in his September 26, 2016 report.  (AR 78).  The orthopedist visit on September 13, 2016 resulted in a normal physical exam and an x-ray which revealed "no acute or chronic abnormalities."  (AR 219).

pain control, which would be expected if Mr. Eigner had ongoing impairing pain levels."  (AR 207).  *Moutour v. Hartford Life and Accident Ins. Co.*, 588 F.3d 623, 634-35 (9th Cir. 2009) ("In addition to the absence of objective quantification of pain levels Dr. Brown and Dr. Sukhov also observed that (1) Montour's pharmacy records indicate he was using limited and relatively mild pain medication; and (2) his medical records with Dr. Kengla suggest that he had not recently engaged in any pain treatment programs.  These observations probably constitute sufficient 'objective' evidence to support their conclusion that Montour's pain does not rise to the level of disabling pain.")

> d.   *All of the Opinions Relied Upon are Detailed Weighing Strongly in Neither Party's Favor*

A fair reading of the Record is that all records are detailed.  Certainly Dr. Mummaneni's twenty-four (24) page IME report is detailed. (AR 1191-1214).  Dr. Krouskop not only reviewed Plaintiff's records and surveillance in detail, he made several efforts to contact both of Plaintiff's treating physicians and spoke to each to discuss Plaintiff's case.  (AR 200-201).  Moreover, when additional medical records were submitted on appeal after he issued his report, he spent additional time reviewing the new records and reconsidering his opinions issuing an addendum.  (AR 76-78).  Given the detail of the opinion of Hartford's IME reviewing physicians – and acknowledging the detail of Plaintiff's physicians including their prepared declarations on appeal – this factor does not weigh heavily for each party.

Under *Shaw* and taking into account the burden on Plaintiff to show by a preponderance of the evidence that Hartford's claims determination was incorrect, the solid and measured opinions of doctors specializing in the very conditions for which Plaintiff seeks disability are more credible, particularly where those

opinions incorporate reasonable restrictions and limitations for his condition and still allow Plaintiff to return to "any occupation."

### 2. The Administrative Record Contains Evidence that Plaintiff's Actual Functionality Exceeded His Self-Reported Limitations

Although Plaintiff claimed he was wholly disabled from any alternative occupation due to neck, shoulder and back pain, his reports to his doctors and Hartford's in-person interviewer as well as the surveillance itself belie this assertion. On repeated occasions, there is a disconnect between Plaintiff's self-reported capabilities and his actual functionality. For instance, Plaintiff reported to Hartford's interviewer that he could only drive 5-10 minutes maximum and could only sit in a vehicle for about 30 minutes. (AR 1326). Yet, he was captured driving a recreational vehicle for most of a fourteen hour day at the "Surf Rodeo." (AR 1333-1340; Video). Even Plaintiff's friends and family that submitted declarations in support of his appeal admitted that Plaintiff spent most of the day either driving or sitting in the golf cart. (AR 366, 368, 371).[6] In addition to that day, Plaintiff also admitted that, since 2010, "I've gone to Kauai (Hawaii) a couple of times, and I've been to Mexico, I think, twice." (AR 1309). Such airplane trips clearly require sitting for more than 30 minutes.

In addition to sitting more than 30 minutes and driving more than 5-10 minutes, the surveillance investigators noted that Plaintiff entered and exited a

---

[6] Although Plaintiff submitted his own declaration plus declarations of friends and family in an attempt to "explain away" the surveillance, this Court has determined that such narratives cannot serve as the basis for a finding of disability. *See Shaw*, 144 F. Supp. 3d at 1135-1136 (reviewing narratives submitted by the plaintiff, her friends and family and holding that "[w]hile the court does not doubt that Shaw struggles with symptoms of her condition, ultimately it cannot rely on these narratives to find that Shaw is entitled to disability benefits…Given that courts discount the opinions of doctors outside the area of their specialty, the reports from individuals with no medical background cannot overcome medical evidence and should receive even less weight.")

vehicle; closed a garage; pumped gas; bent at the waist as he screwed on a gas cap; leaned into the golf cart and sorted through items; lifted the bed of a golf cart and locked it into position; put his hands on his knees, unloaded equipment from the golf cart; carried four orange cones and placed them on the ground; carried several cases of water; carried a trash bag; carried a stroller and placed it in the back of the golf cart; retrieved the stroller from the cart; lifted a bale of hay; twisted to the left as he looked behind himself; ran; walked; bent at the waist as he moved a tarp; ascended and descended stairs; and bent at the waist on several occasions. (AR 1328).

In prior cases, this Court has viewed surveillance that reflects greater-than-reported functionality as persuasive. *See, e.g. Safavi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1119 (C.D. Cal. 2007) (relying in part on surveillance to find that "…Plaintiff has 'engaged in recreational and life activity inconsistent with [her] claim of disability'"). Courts outside of the Ninth Circuit have also routinely looked to surveillance as a relevant tool in evaluating a claimant's self-reported limitations and in weighing the correctness of an administrator's ultimate claims decision. *See, e.g. Larson v. Old Dominion Freight Lines, Inc.*, 481 F. Supp. 2d 451 (M.D.N.C. 2007) (granting judgment for defendant based in part on surveillance video and acknowledging that while "one may assume … the video would not [itself] reveal the total picture with respect to Plaintiff's condition and ability to work. That does not call for refusing to consider [it]…"); *Hilyer v. Hartford Life and Accident Ins. Co.*, No. 2:09–cv–00843–JHH, 2011 WL 925027, at *15 (N.D. Ala. Jan. 31, 2011) (finding that "it is not Plaintiff's ability or inability to perform individual tasks that is telling, but rather Plaintiff's actions on the day surveillance was taken as a whole" in ruling in defendant's favor on summary judgment); *Marantz v. Permanente Med. Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 329-330 (7th Cir. 2012) (finding surveillance to be

a helpful tool for courts to consider when used in conjunction with other medical evidence and demonstrating inconsistency between a claimant's actual abilities and reported abilities).

In addition to the surveillance, Plaintiff himself reported to his various physicians engaging in activities that stand in stark contrast to his representations to Hartford and his treating physicians' functionality opinions.  Plaintiff denied any physical activity other than walking the dog and going to the gym occasionally. (AR 1326).  Leading up to his 2016 denial, Plaintiff admitted to his doctors that he had increased his workouts (AR 1358), played golf once or twice a month (1201, 1360), traveled as described above, and physically fought a lifeguard (which led to his arrest) (AR 1362).  The multiple inconsistencies between his representations to Hartford and his actual functionality provided Hartford substantial evidence to terminate his claim.  When this multitude of evidence is compared to Plaintiff's, his internist's and his chiropractor's exaggerated claims that he cannot perform any work, it is abundantly clear that Plaintiff has not met his burden of establishing entitlement to continuing benefits and Hartford's decision was legally correct.

## IV.  CONCLUSION

As demonstrated above, Hartford's decision to terminate benefits under the Policy as of February 29, 2016 was correct.  Therefore, its decision should be affirmed and summary judgment should be entered in its favor on Plaintiff's claim.


DATED: September 15, 2017          MAYNARD, COOPER & GALE LLP


                                                 */s/* Linda B. Oliver
                                                 Linda B. Oliver
                                                  *Attorney for Defendant*
                                                 *Hartford Life and Accident*
                                                 *Insurance Company*

**CERTIFICATE OF SERVICE**

I am employed in the County of San Francisco, State of California. I am over the age of eighteen years and not a party to this action. My business address is 600 Montgomery Street, Suite 2600, San Francisco, CA 94111. On September 15, 2017, I served a copy of the following documents:

**DEFENDANT'S SUMMARY JUDGMENT MOTION**

[x]   CM/ECF ELECTRONIC SERVICE: The following are registered CM/ECF users with the Court, and have consented to service through the Court's automatic transmission of a notice of electronic filing.

THE FLEISHMAN LAW FIRM
Charles J. Fleishman
Paul A. Fleishman
21243 Ventura Blvd., Suite 141
Woodland Hills, CA 91364
Attorney for Plaintiff
David Eigner

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on September 15, 2017, at San Francisco, California.

_____
Rachel Ouk